UNION TRUST CO, REORGANIZATION
OF, In Re

Ohio Common Pleas, Cuyahoga Co

Decided Feb 18, 1938

John B. Putnam, Cleveland, for propon-
ents of plan.

E. S. Lindeman, Special Counsel, Cleve-
land, for Herbert S. Duffy, Atty. General,
for Samuel H. Squire, Supt. of Banks.

Sidney N. Weitz, Cleveland, Douglas F.
Schofield, Cleveland, and J. W. Wursthorn,
Cleveland, for objectors to plan.

Bernstein & Bernstein, Cleveland, for
intervening petitioner.

## OPINION

By KRAMER, J.

The question before the court is upon
the approval of a proposed plan for re-
organizing the affairs of the Union Trust
Company. ·The plan comes before the
court with the endorsement and unquali-

fied approval of S. H. Squire, superintendent of banks of the State of Ohio, who is charged by law with the administration of the assets of the Union Trust Company and is officially charged in a trust capacity with the administration of these assets for the best interests of the depositors and stockholders. The plan carries also the unqualified endorsement of Oscar L. Cox, deputy superintendent of banks in charge of liquidation of the Union Trust Company, and of Alfred A. Benesch, director of commerce of Ohio, and head of the division of the state government of which the banking division is a part.

The plan carries the approval of something over 80% in number of the depositors (excluding the 43,675 depositors, who have claims of not more than $50, who will be paid in full) representing approximately 90% in amount of the deposits,—in figures $93,583,500; and of approximately 80% of the stockholders who have fully paid their double liability representing over 91% of such shares outstanding; in number 588,000 shares.

In opposition to the plan there are of record six depositors representing less than $25,000 in amount. Five of these depositors (including one whose unrevoked consent is upon file) have appeared by counsel and one by letter.

The opinion of these officials, and particularly the approval of the plan by so overwhelming a majority of the depositors and stockholders, does not relieve the court of its obligation fairly to consider the objections which have been made and to pass upon the plan upon its merits. They do, however, appear to warrant the court in approaching its examination of the plan in the attitude that unless there appears clearly therein, or is lacking therein, something of compelling importance, the plan should receive its approval. And also if any feature of the plan presents a matter of judgment upon which minds might reasonably differ, the court would not feel it would be warranted in imposing its conclusion against that of the great majority of the depositors and stockholders who have found it acceptable.

The objections to the plan are:

First: That it is illegal in that it does not constitute a sale of the assets of the Union Trust Company under the statute and is therefore a deposition of such assets which the superintendent of banks is not empowered to make.

Second: That it does not provide for the payment of interest upon deposits to the depositor.

Third: That the noteholders' committee of Union Properties, Inc., and the trustees of the stock of the new bank are self-appointed and self-perpetuating and are not subject to any control on the part of the depositors or stockholders.

Fourth: That the plan unfairly prefers stockholders to creditors.

1.

The legality of the plan is, of course, fundamental to its approval. It is contended by the objectors that the superintendent of banks has no power to make the transfer of the property which has come into his hands to Union Properties, Inc., and to the Union Bank of Commerce Company, as is provided in the plan. It is argued that the transfers proposed are not in legal effect sales; that they are only a delegation by the superintendent to the Union Bank of Commerce and Union Properties, Inc., of his duty to liquidate the assets of the Union Trust Company, and that such delegation cannot lawfully be made by the superintendent of banks.

The statute upon which this proposed plan is based is §710-95, GC, and is as follows:

"Without prejudice to or limitation of the foregoing powers, authorities and duties, the superintendent of banks may, upon application to the Common Pleas Court in which the proceedings for liquidation of such bank are pending, or a judge thereof, and on such terms as such court, or such judge, may order or approve:

"(1) Sell or compromise any or all bad or doubtful assets and debts owing to such bank; compromise claims against such bank, and sell, lease, exchange or otherwise dispose of any real estate or personal property or both of such bank in whole or in part."

The objectors rely principally upon the case of Jackson v McIntosh, 12 Fed. 676 (1926). In that case the receiver of an insolvent national bank proposed to transfer certain assets held by him as such receiver to a corporation in exchange for its debentures, which were to be issued to the creditors of the insolvent bank. The payment of these debentures were to be secured by deed of trust covering the assets transferred. The transferee's obligation under these debentures was limited, however, to its contractual duty to dis-

tribute ratably among the holders thereof the proceeds to be derived from the liquidation of the transferred assets. Although $10,000 was paid in by the organizers of the transferee corporation, the debentures themselves expressly provided that the holders thereof should have no recourse against this capital.

The court held:

"The creation of an agency for the handling and administration of assets and the payment of the proceeds less costs and expenses to those who are entitled to such assets is not a sale of them. A change in the beneficial ownership of the thing dealt with, and a price paid or promised, certain or capable of being ascertained, are essential ingredients of a sale."

The instant plan does not seem to come within the purview of this holding. This plan provides for a complete and absolute transfer of all legal and equitable title to the assets of the Union Trust Company by the superintendent and the receipt of a price paid to him in cash and notes "certain or capable of being ascertained."

In consideration for these assets he receives:

1. A deposit credit of some $38,000,000.

2. Creditors notes of Union Properties, Inc., in a face amount of some $21,000,000.

3. Contract obligations of Union Properties, Inc., for additional cash and creditors notes.

These considerations are supported by the following in addition to the assets transferred:

1. $1,120,000 of new money paid in for stock of the new bank.

2. The surrender by participating stockholders of their rights to a return of all or any part of the $17,000,000 paid in by them.

3. The pledge of shares of the new bank as security for the face amount of the creditors' notes.

There is cited also the case of Ex Parte Moore, 6 Fed. (2nd) 905 (1925); particularly the holding therein that the provision of the plan there involved which required the dissenting creditor of the insolvent bank to accept a deposit in the purchasing bank for 60% of his claim was improper because it compelled the creditor to accept a new debtor. It is also held in the Moore case following the case of Jackson v McIntosh, supra, that the transfer to the purchasing bank of certain of the assets in trust for creditors of the insolvent bank to whom the certificates of participation were to be issued under circumstances requiring the purchasing bank to liquidate those assets and distribute the proceeds to certificate holders was an unlawful abdication by the receiver of the duties imposed upon him by law.

The Union Trust plan does not contain either of these objectionable features. The creditors are not required to accept a deposit in the new bank but will receive their dividends directly from the superintendent unless they elect to receive them by way of deposit. The transfers proposed by the Union Trust plan effect a complete sale and change in the legal title and beneficial ownership of the assets for a legal consideration.

The court has examined the cited cases of In Re LaFayette Bank & Trust Company, 198 N. C. 783, (1930); Ellis v Little, 27 Kan. 707; and Peoples State Bank of Dakota v Francis, 8 N. D. 369.

These cases contain no holding which indicates any illegality in the plan here under consideration, and the court finds no decision in these cases with which the provisions of the proposed plan do not conform in law.

The proponents of this plan appear to have had carefully in mind the illegality found in the cases above cited in the plans which were in these cases considered and to have carefully and successfully avoided incorporating any proposal of the same character in the instant plan.

This plan has apparently been modeled upon the plan approved in the case of Gockstetter v Williams, 9 Fed. (2nd) 354 (1925); 9 Fed. (2nd) 928, which case appears to support squarely the provisions of the plan herein proposed. In this case the receiver of an insolvent national bank proposed to transfer substantially all of the assets of the insolvent bank to a new bank in consideration of the issuance by the new bank to the creditors of the insolvent bank of certificates of deposit, payable over a period of five years and equal in face amount to the preferred and secured claims against the insolvent bank and of 50% of the general claims against such bank. The assets proposed to be transferred were segregated as between C and D assets. The C assets were to become the absolute property of the new bank, and the D assets, the new bank was to transfer to trustees designated in the court's order.

A certificate of claim secured by a first lien upon the D assets and equal in face amount to the difference between the par

value of the certificates of deposit to be issued by the new bank and the value of C assets transferred to the new bank, was to be issued by the trustees of the new bank. After the payments of these certificates of claim, any of the D assets remaining were to be liquidated by the trustees and the proceeds distributed to creditors of the insolvent bank. It was contended that the transaction proposed to be entered into by the receiver was not a sale of assets within the meaning of the National Bank Act.

The Circuit Court of Appeals, confirming the District Court, held that this transaction constituted a sale, and sustained its validity.

Broderick v Betco Corp., 265 N. Y. Supp. 139 (1933) is to the same effect.

It should be noted that the Ohio Statute, §710-95, GC was amended in March, 1933. Prior to such amendment the statute authorized the superintendent only to sell real estate and personal property of an insolvent bank. The amendment broadened his powers by authorizing him "to sell, lease, exchange or otherwise dispose of" such property.

Under this enlarged power it might well be argued that even though the present transaction did not constitute a sale within the definition laid down by the courts, that it would still not be illegal under the decision cited by the objectors.

The court is of the opinion, however, that the Union Trust plan does in fact constitute a sale within the █ purview of the decided cases and that its legality cannot be successfully challenged.

## 2.

The second objection is that the plan does not provide for the payment of interest upon deposits to the depositors.

It is not claimed, and of course could not be, under the statute, that the depositors are entitled to receive bank █ interest; the claim is that they are entitled to receive what is called damage or penalty interest at the rate of 6% from the date of the closing of the bank, and it is further claimed that such interest is payable not only from the assets of the bank but from the double liability payments of the stockholders.

There has been no authoritative determination of the question whether or not such interest is recoverable. But it does not seem necessary for the court to determine this question. The plan provides for an outright sale or disposition otherwise of the assets now in the hands of the superintendent. It appears that after the sale the depositors will have the same right with respect to interest as they now have, unless they make voluntary settlement with the superintendent by exchanging their claims for creditors' notes. The comparative estimates of the ultimate realization of liquidating values, if this plan be adopted, as against those if it be not adopted and the liquidation continued in its present form, made by the superintendent of banks (Plan Exhibit D) has not been challenged. This estimate shows under the plan, without an allowance of interest, a surplus of $8,499,535.79 without the plan and without interest a deficit of $1,254,311.49. If the plan be rejected therefore the depositors apparently will lose not only interest but also will not receive full payment of their principal. Under the plan there is a reasonable probability of their receiving full payment of their principal, along with some probability, or possibility, of something in excess thereof by way of interest. If the plan be rejected then the probability is that they will not even receive full payment of their principal.

It is rather inconceivable that any depositor should desire to reject a plan which offers him the probable return of his principal with a chance for something in excess thereof, because it does not assure him of enough more to pay full damage interest, in favor of the continuance of one, under which his right to such interest might finally be adjudicated in his favor, but which would offer no reasonable probability of his ever receiving any of it, and would endanger the return of his principal.

Perhaps the objectors had in mind that the court should amend the present plan by incorporating therein a provision for the redistribution of the consideration to be received by the superintendent so that the stockholders would receive nothing until after full damage interest had been paid to the depositors. It would be fatal to the plan for the court so to do, because it is of record that the stockholders would contest such an amendment. Without the agreement of the stockholders not only would one of the principal purposes of the plan, namely the payment of the 35% dividend, be defeated, but the whole structure of the plan would be so affected by such an amendment, that it would be tantamount to a complete rejection of the plan.

**3.**

The objection that the noteholders' committee of the Union Properties Company, Inc., and trustees of the stock of the new bank are self-appointed and not subject to any control on the part of the depositors or stockholders is entitled to serious consideration. The objection that these individuals are self-appointed should be eliminated by reason of the fact that the consents of the depositors and stockholders virtually amount to an election of the men whose names are contained in the plan to their proposed positions. The question whether these trustees should have a permanent tenure without control by the persons beneficially interested in the administration of their trusts or whether they should be subject to reelection or some form of supervision by those persons, raises a question the principles of which are familiar to everyone and which have been the subject of endless debate. The question involves the recognized greater efficiency of permanent tenure and full authority, opposed to the safeguard against the abuse of that authority or even its approval of conduct within that authority, afforded by a right vested in the parties beneficially interested to effect a change of personnel in the trustees or committeemen or to review their transactions.

The court has determined that the provisions of the plan in this regard do not constitute a sufficient objection to its adoption for the following reasons.

(1) The right of approval upon any proposed change in the provisions relating to the organization of the bank is reserved to the certificate holders (plan page 23) (1), (2), (3), and (4).

(2) The principal single asset herein involved is the Union Trust Building. It has been considered that the sale of this building might involve so many considerations and circumstances, judgment upon which might create controversy, that the court is advised that appropriate provisions will be incorporated in the agreement between the superintendent of banks and the Union Properties, Inc., making any sale of such building subject to the approval of the majority of a board of three persons, one to be chosen by the United States District Judge for the Northern District of Ohio, Eastern Division, another by the note-holders' committee and a third by the two so chosen.

(3) The stockholders and depositors almost unanimously, on the part of those who have expressed themselves, have indicated that they are content to place their confidence in these trustees and the committeemen and to entrust them with the administration of these assets in the form provided by the plan.

**4.**

As to the fourth enumerated objection, that the plan unfairly prefers stockholders to creditors, it is only necessary to say that it does not. It is not suggested where the objector making this claim finds anything in the plan to substantiate it. The plan distinctly provides that before stockholders can receive a penny the depositors and other creditors must be paid the full face amount of their claims.

Counsel for Douglas F. Schofield has submitted figures from which he draws certain conclusions, among which are that the dividends proposed to be paid under the plan could be paid without the adoption of the plan, and that the depositors contribute more to the plan than they receive. The court does not deem it proper to extend this opinion by a review of these figures and must content itself with saying that it finds that when corrected by the record they do not support the claims which counsel deduces from them.

Counsel have appeared for certain of the so-called non-book creditors, asking that the court protect their rights under this plan. The plan provides that a reserve of $7,166,422.81 be set up for the payment of these claims which amount in face value to some $22,000,000. It is represented to the court by the superintendent of banks who has the same responsibility to these claimants as to other creditors, that this reserve is sufficient to protect these claims. It also appears further that the obligation of these claims in such amount as they are found valid will have priority against the assets to be transferred to Union Properties, Inc., over its obligations on its creditors' notes.

There remains to be noticed the objector A. Shaw, who sets up that he was a stockholder in the Union Trust Company; that the superintendent of banks assessed a double liability against him in the amount of $50,000 which he compromised for $10,000. He says that he and other stockholders similarly situated receive nothing under the plan, while those who paid in full receive stock in the new bank. This, he asserts, is unjust and inequitable and asks that provision should be made in the plan

for all stockholders in proportion to the amount which they have paid in upon their double liability assessment.

This petitioner and others similarly situated, by virtue of their compromise agreements, are shielded from suit for the unpaid balance of their assessments. Were such agreement not in force not only could judgment be taken against them, but any benefits, which might be allocated to them could immediately be seized by the superintendent of banks and applied upon the unpaid balance due, upon ▮ such judgment. It would be wholly inequitable to permit this stockholder to be relieved of 80% of his liability and to receive back also part of the 20% which he had paid, until the stockholders who have paid in full, should have first been paid 80% of the amount which they had contributed, so that all stockholders should be on an equal footing. Of the $17,000,000 paid in by the stockholders of the Union Trust Company, over $16,000,000 is from those who have paid in full. The maximum which these stockholders who have paid in full can hope to receive under the plan is so far removed from what they would be entitled to receive before these partial payment stockholders would be entitled to participate, that it would serve no purpose to amend the plan to cover a contingency which cannot possibly occur.

The conclusion of the court is that the objections made to this proposed plan are not well taken and present no ground of illegality or inequity which would warrant the court to withhold its approval.

Inasmuch then as the plan seems to provide a method for winding up the liquidation of the Union Trust Company by which the maximum value will be realized from its assets, and inasmuch as this plan is approved by the superintendent ▮ of banks and acceptable to and approved by the great majority of the depositors and stockholders, both in numbers and amount and adequately protects the non-book claimants, there seems to be no reason why it should not receive the approval of the court.

Therefore the application for the approval of the plan submitted herein for reorganizing the affairs of the Union Trust Company is granted, and the plan is approved.

The court has not considered that any civic benefit which might result to the community by the adoption of this plan or any considerations outside of the merits of the plan itself, were entitled to be considered in passing upon the rights of those whose money is involved in this liquidation,. Approval of the plan having been given, it may be proper to suggest to that small minority which is in opposition, that, in determining whether or not that opposition should be continued, consideration should be given to the desire, and in many cases the necessity of the great majority of the depositors to receive the payment of the 35% dividend, which will result from the adoption of the plan.

The constructive and stimulating effect which the lifting of a situation undoubtedly commercially and civically depressing, along with the release of the amount of money represented by this dividend which should flow into the business life of Cleveland should inure to the benefit of both the city and its citizens. The effect which may reasonably be anticipated in this regard from the adoption of this plan upon this community, and particularly at this time should further be entitled to thoughtful consideration upon the part of the objectors in determining their further conduct.'